Aaron E. Klein, J.
In this CPLR article 78 proceeding petitioner (Rockland County) seeks a judgment against respondents (representing the New York State Department of Mental Hygiene) directing (1) the apportionment of aggregate costs between the State and Rockland County under section 11.23 (subd [b], par [1]) of the Mental Hygiene Law "on the basis of the population of Rockland County as determined by the last preceding federal census” (for the year 1970) and (2) that Rockland County’s contribution for unified mental health services under section 11.23 (subd [c], par [1]) of the Mental Health Law be computed against a "base year local contribution” with percentile variations for successive fiscal years compared with the "base year local contribution” in such manner that Rockland County not be required to increase its local contribution for any fiscal year in which the local contribution equals or exceeds the "base year local contribution.”
CPLR 7803 (subd 3) gives this court jurisdiction to determine whether respondents’ construction of section 11.23 of the Mental Hygiene Law is "a determination * * * made in *699 violation of lawful procedure * * * affected by an error of law or was arbitrary and capricious or an abuse of discretion.”
The court begins with reference to judicial observations concerning the general principles to be applied in this case.
Mr. Justice Harold Stevens observed in a factually distinguishable, but instructive case, Matter of Kayfield Constr. Corp. v Morris (15 AD2d 373, 378-379): "It is not the function of judicial review in an article 78 proceeding to weigh the facts and merits de nova and substitute its judgment for that of the body reviewed, but only to determine if the action sought to be reviewed can be supported on any reasonable basis. (Cf. Matter of Diocese of Rochester v Planning Bd., 1 NY 2d 508, 520) * * * Reasonable men may reasonably differ, but the agency or person saddled with the responsibility of decision, absent fraud, collusion, illegality or action clearly arbitrary and without foundation, should have its decisions upheld. Moreover, a presumption of regularity attends the action of the board, and it is incumbent upon the petitioner to overcome the presumption and establish the action to have been without reasonable foundation. Since the board had the information before it, we cannot say the action of the board is without some reasonable basis.” (Emphasis added.)
Associate Judge Lawrence Cooke writing for a unanimous Court of Appeals in Matter of Albano v Kirby (36 NY2d 526, 529-531), also factually distinguishable, said: "In the construction of statutory provisions, the legislative intent is the great and controlling principle (Matter of Petterson v Daystrom Corp., 17 NY2d 32), same being sought first in the words of the statute under consideration (Department of Welfare of City of NY v Siebel, 6 NY2d 536, 545; Matter of Bowne v Bowne Co., 221 NY 28, 31) * * * No rule of construction, however, permits the segregation of a few words from their context and from all the rest of the section or rule for purposes of construction (Wilson v Israel, 227 NY 423, 427; People ex rel. Board of Supervisors of County of Rockland v Travis, 184 App Div 730, 732, affd 226 NY 703), and the enacting body will be presumed to have inserted every provision for some useful purpose (Matter of Smathers, 309 NY 487, 495; Matter of Tonis v Board of Regents of Univ. of State of N. Y., 295 NY 286, 295) * * * In analyzing a statute or rule, courts look to their spirit and purpose, and the objectives of the enactors must be kept in mind (Matter of Hogan v Culkin, 18 NY2d 330, 335).”
*700 Former Chief Judge Stanley H. Fuld in a 5 to 2 Court of Appeals decision in Matter of Howard v Wyman (28 NY2d 434, 438) also factually distinguishable, said: "It is well settled that the construction given statutes and regulations by the agency responsible for their administration, if not irrational or unreasonable, should be upheld. (See, e.g., Matter of Mounting & Finishing Co. v McGoldrick, 294 N. Y. 104, 108; Matter of Colgate-Palmolive Peet Co. v Joseph, 308 N. Y. 333, 338; Udall v Tallman, 380 U. S. 1, 16-18; Power Reactor Co. v Electricians, 367 U. S. 396, 408.) As this court wrote in the Mounting & Finishing Co. case (294 N. Y., at p 108), 'statutory construction is the function of the courts "but where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court’s function is limited” (Board v. Hearst Publications, 322 U.S. 111, 131). The administrative determination is to be accepted by the courts "if it has 'warrant in the record’ and a reasonable basis in law” (same citation). "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body” ’ (Rochester Tel. Corp. v. U.S., 307 U.S. 125, 146).”
Finally in Matter of Carey Transp. v Perrotta (34 AD2d 147, 149) in a 3 to 2 Appellate Division, First Department majority opinion, affirmed 29 NY2d 814, Mr. Justice Emilio Nunez said: "Ordinarily courts will defer to legislative interpretation or interpretation given by the agency to the legislation that it administers.”
Sections 7.05 and 7.09 of the Mental Hygiene Law clearly give broad powers to respondents for "developing comprehensive plans, programs, and services in the areas of research, prevention, and care, treatment, rehabilitation, education, and training of the mentally ill, the mentally retarded, and those suffering from alcoholism, narcotic addiction, or drug abuse.” (Mental Hygiene Law, § 7.05, subd [a].)
If this court finds the Mental Hygiene Department’s construction of paragraph (1) of subdivision (b) and/or paragraph (1) of subdivision (c) of section 11.23 of the Mental Hygiene Law to have a reasonable basis in law, then under the prevailing rules of statutory construction it cannot substitute its interpretation of the statute for that of the Mental Hygiene Department.
Prior to the enactment of section 11.23 of the Mental *701 Hygiene Law State aid to local government was based on a formula which required the State to reimburse local government 50% of the net operating costs the local government incurred in the treatment of mentally ill individuals domiciled in institutions. During this same period of time the State bore the entire cost of treatment for mentally ill individuals who were treated in State institutions operated by the Mental Hygiene Department, and no significance was given to the county in which the mentally ill patient was domiciled.
Apparently, this method of sharing of costs for treatment of the mentally ill was found self-defeating in that local governments had clear financial incentive to transfer their mentally ill domiciliaries to State institutions located in other counties, where the State bore the full expense of treatment.
To discourage the transfer of mentally ill patients from communities where they were domiciled, it appears the Legislature passed a "unified services plan” which is described in paragraphs 1 and 2 of subdivision (a) and subdivision (e) of section 11.19 of the Mental Hygiene Law as follows:
"(a) 1. A unified services plan is a plan for the rendition of unified services which is designed to provide a broad range of services for all the mentally disabled of the area or part of the area over which a local government has jurisdiction. Such a plan must have been developed, in accordance with the regulations of the commissioner, by the joint and continuous planning of the local governmental unit, the department, and, with respect to any part of the area covered by the plan which is served by department facilities, the directors of such facilities and with the involvement of consumers, consumer groups, voluntary agencies and other providers of services. The plan must be submitted by the local governmental unit and approved by the commissioner. The plan must provide for the rendition of appropriate services in department facilities for all persons coming from such area needing such services. If there has been disagreement in the development of the plan by the director of a department facility providing services to the area, the disagreement shall be brought to the attention of the commissioner who shall evaluate the issues and make a determination resolving them.
"2. The department regularly shall conduct evaluation studies on a statewide or representative sample basis to determine the relative costs and effectiveness of different types and patterns of services being provided under unified service *702 plans. Such information developed shall be used to determine standards for program requirements and priorities and to establish guidelines for the allocation of funds. * * *
"(e) After approval of a unified services plan, services for the mentally disabled of the area served by a local governmental unit which are provided by such local governmental unit or any of the department’s facilities shall be in accordance with and pursuant to such unified services plan. Services (including both inpatient and out-patient services) provided by department facilities pursuant to a unified services plan shall be provided pursuant to contracts between the department or its facilities and the local governmental unit. Alternatively, if the department and a local governmental unit agree, state facilities may, in whole or in part, be used by or leased, rented, or sold to such local governmental unit or to a voluntary agency, in accordance with applicable state law, for operation by or through it pursuant to a unified services plan. Such local governmental unit may lease a facility or facilities for the department if the program to be housed in such facility is part of the approved unified services plan.” (Emphasis supplied.)
The apparent purpose for the "unified services plan” was to establish a co-operative venture between State and local government to encourage planning, development, and sharing the cost of services for treatment of the mentally ill.
Local governments choosing to participate in the unified services plan would contribute to the cost of treatment for mentally ill domiciliaries treated in the county, and in institutions operated by the Mental Hygiene Department outside the county. The over-riding purpose expressed in paragraph 1 of subdivision (a) of section 11.19 of the Mental Hygiene Law, quoted above, was to provide treatment for all mentally ill persons domiciled in the county who required treatment. The cost-sharing mechanism, as set forth in subdivision (e) of section 11.19 of the Mental Hygiene Law, quoted above, is to be contracts between the State and local government units covering payments for in-patient and out-patient treatment of the mentally ill.
1. Paragraph (1) of subdivision (b) of section 11.23 of the Mental Hygiene Law’s definition of "population.”
Rockland County objects to the administrator of the unified services plan, acting pursuant to section 11.19 et seq. of the *703 Mental Hygiene Law, interpretation of the term "population” to mean total population less inmates in State institutions in Rockland County.
This court finds the administrator’s interpretation of "population” to have a reasonaffibe basis in law. Article 4-A of the State Finance Law titled 'YState Assistance to Local Government”, in clause (1) (subd 1, par a) of section 54 defines "population” and refers to "the latest preceding decennial federal census completed and published as a final population count by the United States bureau of census”.
Clause (5) (subd 1, par a) of section 54 of the State Finance Law excludes from the term "population” several categories of individuals including "inmates of state institutions under the direction, supervision or control of the state correctional services department and state department of mental hygiene.”
Moreover, the Federal census itself, is subdivided into many categories, including a separate category entitled "Inmate of Institution.”
The unified services plan administrator’s defining "population” to exclude inmates of State institutions under treatment in the county appears to comport with the Legislature’s intent in section 11.23 (subd [b], par [1]) of the Mental Hygiene Law. Subdivision (b) of section 11.23 apportions aggregate costs for mental treatment between State and local governments in the following manner: "(1) Subject to the provisions of subdivision (c) of this section, aggregate costs shall be apportioned between the state and the local government on the basis of the population of each local government as determined by the last preceding federal census. The aggregate costs shall be determined for each local government and there shall be deducted therefrom a local population credit of ten dollars per capita for the first one hundred thousand of the population of the local government and five dollars per capita for the remaining population of such local government. If such aggregate costs are less than such local population credit, the aggregate costs shall be financed on the basis on one hundred percent state funds up to the amount of such aggregate costs. If the amount of such aggregate costs exceeds such local population credit, the balance of such aggregate costs over the local population credit, up to thirteen dollars per capita, shall be financed on the basis of eighty percent state funds and twenty percent local contribution with all remaining aggregate costs financed on the basis of sixty-five percent state funds and thirty-five *704 percent local contributions. Aggregate costs shall not include the cost of services given to any persons (i) who are patients in a state facility and not residents of the particular local government”. (Emphasis added.)
It is evident from the emphasized language that it was intended that local governments participating in the unified services plan be potentially responsible for the costs of treatment for their mentally ill domiciliaries treated in facilities operated by the State Department of Mental Hygiene. The unified services plan administrator’s excluding inmates from State institutions in defining "population” under section 11.23 (subd [b], par [1]) of the Mental Hygiene Law is consistent with the statutory language which appears to make local governments potentially responsible for the cost of mental treatment of their domiciliaries, even if the treatment is administered in facilities other than those located within the geographic area under the jurisdiction of the local government. The "population” interpretation suggested by petitioner would apppear to permit a local government to receive State aid for the treatment of persons technically resident within its geographic limits by virtue of their being inmates in State institutions, but for whose treatment the local government has no actual fiscal responsibility. Petitioner’s suggested interpretation, therefore, seems inconsistent with the statutory purpose of removing the incentive for local governments to transfer their mentally ill domiciliaries to State institutions in other localities, and thereby avoid the financial burden of treatment for such persons.
Based on the foregoing this court cannot say that the unified services plan administrator (representing respondents) acted arbitrarily, capriciously, or without reasonable basis in law by excluding inmates of State institutions from the term "population” in paragraph (1) of subdivision (b) of section 11.23 of the Mental Hygiene Law.
2. The formula to determine Rockland County’s contribution to treatment for mentally ill under section 11.23 (subd [c], par [1]) of the Mental Hygiene Law.
To provide for an equitable apportionment of the start-up costs for the unified services plan between State and local government subdivision (c) of section 11.23 of the Mental Hygiene Law provides: "(c) (1) As used in this subdivision:
"(i) 'Aggregate costs’ and 'local contribution’ shall have the *705 meanings assigned thereto in paragraph (1) of subdivision (b) of this section.
"(ii) 'Base year local contribution’ shall mean that portion of the funds for net operating costs of local services actually provided by a local government and by any voluntary agency providing services pursuant to a contract with the local governmental unit under a local services plan during the year immediately preceding the first effective date of a unified services plan for such local government.
"(2) To reduce any adverse fiscal impact on local governments wherever the local contribution as calculated for the first local fiscal year under paragraph one of subdivision (b) of this section exceeds the base year local contribution,the local contribution shall be reduced by the amount of such difference in the first local fiscal year, eighty percent of the same amount in the second local fiscal year, sixty percent of the same amount in the third fiscal year, forty percent of the same amount in the fourth fiscal year and twenty percent of the same amount in the fifth fiscal year. Thereafter, the local contribution shall be determined pursuant to paragraph one of subdivision (b) of this section.
"(3) To reduce any adverse fiscal impact on the state wherever the local contribution as calculated for the first local fiscal year under paragraph one of subdivision (b) of this section is less than the base year local contribution, the local contribution shall be increased by eighty percent of the amount of such difference in the first local fiscal year, sixty percent of the same amount in the second local fiscal year, forty percent of the same amount in the third fiscal year, and twenty percent of the same amount in the fourth fiscal year. Thereafter, the local contribution shall be determined pursuant to paragraph one of subdivision (b) of this section.”
New York State Commissioner of Mental Hygiene construes section 11.23 (subd [c], par [2]) of the Mental Hygiene Law to mean that whenever the local contribution by the county for the first year it participates in the unified services plan exceeds the local contribution made by the county in the previous year (under the old system for calculating State aid) the local government’s contribution shall be reduced according to this formula:
(1) in the first fiscal year the local government participates in the unified services plan its contribution will be reduced by the full amount of the excess;
*706 (2) in the second fiscal year of local government participation its contribution will be reduced by 80% of the excess (as computed in paragraph (1);
(3) in the third fiscal year of local government participation its contribution will be reduced by 60% of the excess (as computed in paragraph (1); and so on as specified in paragraph (2) of subdivision (c) of section 11.23 of the Mental Hygiene Law through fifth fiscal year the local government participates in the unified services plan, after which its contribution will be computed as specified in paragraph (1) of subdivision (b) of section 11.23 of the Mental Hygiene Law.
The commissioner’s interpretation of paragraph (2) of subdivision (c) of section 11.23 of the Mental Hygiene Law is literal in its application of the term "same amount”, as used therein.
Petitioner objects to the commissioner’s literal application of the term "same amount” in paragraph (2) of subdivision (c) of section 11.23 of the Mental Hygiene Law. Petitioner urges that such application could require Rockland County, in the four years following its first year of participation in the unified services plan, to increase its local contribution in a fiscal year when its local contribution equals or exceeds its "base year local contribution.” Such result petitioner contends leads to an unreasonable result and must "therefore * * * be presumed to be against the legislative intent.”
Petitioner suggests that the term "same amount” as used in paragraph (2) of subdivision (c) of section 11.23 of the Mental Hygiene Law to be consistent with legislative intent must be applied by making an annual comparison of the costs in each of its second through fourth years of participation in the unified services plan with its "base year local contribution.” The amount petitioner’s local contribution would be reduced in the second through fourth years of participation would, under the interpretation suggested by petitioner, be determined on the basis of an annual comparison, instead of the comparison used by the commissioner in his literal interpretation of paragraph (2) of subdivision (c) of section 11.23 of the Mental Hygiene Law.
Petitioner urges that its suggested interpretation of paragraph (2) of subdivision (c) of section 11.23 of the Mental Hygiene Law will not work hardship or injustice on local governments, whereas the commissioner’s interpretation might work an injustice.
This court finds that the literal interpretation of "same *707 amount” in paragraph (2) of subdivision (c) of section 11.23 of the Mental Hygiene Law given by the Commissioner of Mental Hygiene to be consistent with the apparent legislative intent of providing a gradual increasing contribution by local governments participating in the unified services plan to the costs of providing treatment for their mentally ill domiciliaries, regardless of whether such persons are treated in local or nonlocal institutions.
Paragraph (2) of subdivision (c) of section 11.23, as paragraph (3) of subdivision (c) of section 11.23, of the Mental Hygiene Law was included "to reduce adverse fiscal impact”, not to eliminate such impact. The mere fact literal application of the formula expressed in paragraph (3) of subdivision (c) of section 11.23 of the Mental Hygiene Law does not produce a steadily increasing or decreasing local or State contribution to treatment of the mentally ill is not, in the opinion of this court, sufficient basis to find that the literal interpretation given by the commissioner is arbitrary, capricious or without reasonable basis in law.
None of the cases offered by petitioner: Biancoviso v City of New York (285 App Div 320) dealing with the late notice of claim filing under section 50-e of the General Municipal Law; Williams v Williams (23 NY2d 592) dealing with libel and slander and the defense to same under section 74 of the Civil Rights Law; Matter of Mounting & Finishing Co. v McGoldrick (294 NY 104) where the New York City Comptroller’s determination that petitioner was not wrongfully denied statutory exemption of sales "for resale” was found warranted by record and to have a reasonable basis in law; Matter or Stockwell (210 App Div 753) holding that under section 14 of the Stock Corporation Law in effect in 1924, a nonconsenting stockholder to the issuance of increased stock to employees, has a right to have his stock appraised and paid for; Matter of Austin (109 Misc 584, 586) involving construction of a tax statute where the rule of construction is that such statutes should be applied strictly against the government, as distinct from the rule of construction in this case, presuming validity of agency interpretation of a statute it is charged by law to administer; People v Glubo (5 NY2d 461) holding that defendants were properly convicted of a conspiracy to violate section 421 of the Penal Law dealing with false advertising; Matter of Hogan v Culkin (18 NY2d 330) granting prohibition against a New York County Justice to hear the habeas corpus petition *708 of a prison inmate in Dutchess County in violation of CPLR 7004; Ewen v Thompson-Starrett Co. (208 NY 245) holding no violation of section 3 of the Labor Law in effect in 1913 occurred where workmen preparing granite for use in a municipal building in New York City were paid less than New York City workers performing similar work; Matter of Town of Smithtown v Moore (11 NY2d 238) where petitioners complaining of the inequitable effect of an allegedly erroneous tax equalization rate imposed by a town, were directed to apply for a special equalization rate under section 1314 of the Real Property Tax Law; Saltser & Weinsier v McGoldrick (295 NY 499) dealing with construction of a municipal sales tax law where the rule of statutory construction is almost diametrically opposite to the rule to be applied in reviewing agency interpretation of statutes under CPLR article 78; Kauffman & Sons Saddlery Co. v Miller (298 NY 38) construing section 8 of the Commercial Rent Law in effect in 1948, and finding no clue in legislative history, the scheme of the law, good sense, and common fairness to vary a strict and literal application of statutory language which had reasonable meaning; Matter of Lincoln Park Lanes v State Liq. Auth. (36 AD2d 188) holding that petitioner, who had a beer license since 1960 was not entitled to an exemption from subdivision 7 of section 64 of the Alcoholic Beverage Control Law’s requirement that an establishment seeking a liquor license must be located at least 200 feet away from a church building stand for the principle that a court can substitute its judgment, for the literal interpretation given by an agency to a statutory formula where that interpretation appears to accomplish the over-all object of the legislation apparent from the face of the statute in question.
Accordingly, this court finds that petitioner has not demonstrated the Commissioner of Mental Hygiene’s interpretation of paragraph (1) of subdivision (c) of section 11.23 of the Mental Hygiene Law to be effected by an error of law, arbitrary, capricious, or an abuse of discretion under CPLR 7803 (subd 3).
The relief sought in the petition is, therefore, denied.